UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO ex rel.
RAÚL TORREZ, Attorney General,

Plaintiff,

v.

DARREN K. INDYKE, in his individual capacity and in his capacity as the EXECUTOR FOR THE ESTATE OF JEFFREY E. EPSTEIN and ADMINISTRATOR OF THE 1953 TRUST; RICHARD D. KAHN, in his individual capacity and in his capacity as the EXECUTOR FOR THE ESTATE OF JEFFREY E. EPSTEIN and ADMINISTRATOR OF THE 1953 TRUST; ESTATE OF JEFFREY E. EPSTEIN; and THE 1953 TRUST,

Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

The State of New Mexico, by and through its Attorney General Raúl Torrez, files this action to ensure that Defendants Darren K. Indyke and Richard D. Kahn, who facilitated and concealed Jeffrey E. Epstein's sexual abuse and human trafficking during his life, do not profit after his death from the illegal activity that they enabled and furthered. Through this action, the State seeks to hold these individuals accountable to the fullest extent possible and to ensure that Epstein's assets are distributed to the survivors of his horrific crimes.

# INTRODUCTION

1. For decades, Jeffrey Epstein ("Epstein") groomed, sexually abused, and trafficked hundreds of vulnerable girls and young women, both for his own gratification and to expand his wealth and social influence by making them available to other powerful men. Epstein's abuses were aided, abetted, and enabled by a number of others, including his longtime personal attorney, Defendant Darren K. Indyke ("Indyke"), and his longtime accountant, Defendant Richard D. Kahn ("Kahn").

2. By the time of his death, Epstein was the center of an informal network of associates bound together by a single purpose: knowingly facilitating and concealing his decades-long criminal conduct to preserve and grow Epstein's fortunes and influence. Those who helped Epstein in his exploits included official employees of Epstein or his various corporate entities, such as several personal assistants, household staff, pilots, his lawyer Defendant Indyke, and his accountant Defendant Kahn, as well as social or business connections, such as his confidante and co-abuser Ghislaine Maxwell and the late model agency founder and accused trafficker Jean-Luc Brunel.

3. Epstein, with the help of his associates, trafficked, isolated, and abused survivors at alluring locations, including Zorro Ranch in Stanley, NM ("Zorro" or "Zorro Ranch"), a remote and sprawling estate that served as one such site for almost twenty years.

4. In exchange for furthering Epstein's criminal project and remaining silent about it, his associates received generous salaries, access to elite social circles, and lavish gifts, including being named beneficiaries of his multimillion-dollar estate. These associates, with Epstein at its core, constitute what is referred to herein as the "Epstein Enterprise" (or "Enterprise" for short).

5. Indyke served as Epstein's personal lawyer and part of the Epstein Enterprise for over two decades, from approximately 1995 or1996 until Epstein's death on August 10, 2019. In fact, in a 2009 hearing in the U.S. Virgin Islands, subsequent to Epstein's guilty plea for a sexual offense in Florida, Indyke described Epstein as "kind of my mentor" for whom Indyke had been working "as an attorney, adviser, and personal representative for over 20 years now." Indyke was deeply embedded in Epstein's affairs well beyond his official responsibilities as legal counsel. *See infra* ¶¶ 16-58; 120-158.

6. Among the various roles Indyke played for Epstein, he served as an officer and director of numerous Epstein-related corporate entities and foundations, as a trustee of Epstein-related trusts (including the trust that is the beneficiary of Epstein's estate), and as a facilitator of Epstein's sex trafficking and sexual abuse, arranging payments to survivors to purchase their silence and leave them indebted to Epstein. *See infra id.*

7. Indyke benefited substantially and personally from his work enabling Epstein's sexual abuse and trafficking. Indyke received financial compensation and other benefits, including more than $16 million from Epstein and Epstein-related entities over the period from 2011 to 2019, a loan of $7 million from Epstein that was never repaid, financial assistance from Epstein to purchase homes in New Jersey and Boca Raton, Florida, and coverage for multiple rounds of in-vitro fertilization.

8. Kahn served as Epstein's in-house accountant for over a decade, from approximately 2005 or 2006 until Epstein's death, and during that time he too furthered and concealed Epstein's criminal operations. Like Indyke, Kahn served as an officer and director of numerous Epstein-related corporate entities and foundations, as a trustee of Epstein-related trusts (including the trust

that is the beneficiary of Epstein's estate), and as a facilitator of Epstein's sex trafficking and sexual abuse. In that role, he provided Epstein cash and handled costs for expenses such as Victoria's Secret lingerie, haircuts at the high-end Frédéric Fekkai, and doctor's visits. Kahn additionally monitored the spending of Epstein's survivors and even prepared tax returns for some.

9. When bank compliance officers questioned Epstein's payments of tuition for young women, Kahn vouched for Epstein. Kahn stated publicly that gifts made to women were a "very small fraction of Epstein's spending" and he "did not see them as red flags for abuse or trafficking." Kahn benefited substantially and personally from his association with Epstein, receiving financial compensation and other benefits, including more than $10 million from Epstein and Epstein-related entities over the period from 2011 to 2019, and payment of $4.9 million from Epstein's JPMorganChase ("JPMC") accounts to Kahn's company, HBRK Associates, for the period from approximately 2005 or 2006 until 2013.

10. Indyke and Kahn are both now co-executors of Epstein's estate ("the Estate" or "the Epstein Estate"), both beneficiaries of the 1953 Trust, which inherits the assets of the Epstein Estate, and together the two current trustees of the 1953 Trust. The Epstein Estate remains under the administration of Indyke and Kahn while the probate case is managed in the Superior Court of the U.S. Virgin Islands.

11. As beneficiaries, Indyke and Kahn are, respectively, eligible for bequests of $50 million and $25 million from the Estate, which is currently valued at over $107 million.

12. The Attorney General brings this action *parens patriae* to enforce the laws of New Mexico; to assure its residents that the New Mexico Department of Justice will act to protect them from the harmful effects of criminal sex trafficking enterprises flourishing in the state, particularly

given that attempts at sex trafficking in New Mexico might well re-occur; to ensure that participants in human trafficking are unable to profit from their criminal enterprise; and to recover damages for survivors victimized by the Epstein Enterprise in New Mexico.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

14. This Court has personal jurisdiction over each Defendant pursuant to N.M. STAT. ANN. § 38-1-16 (1971) because Defendants engaged in conduct in New Mexico through their participation in businesses, financial transactions, and accounts registered, held, and operating in New Mexico, and by filing documents with the State of New Mexico. More specifically, as described in further detail in ¶¶ 34-58 *infra*, Defendant Indyke served as Secretary of Zorro Development Corp., which was registered at Zorro Ranch's address, and was a signatory on its bank account from December 20, 2016 through July 8, 2019. Defendant Kahn served as Treasurer and Director of Cypress, Inc., which held title to Zorro Ranch, the site of criminal activity described herein. Defendants thereby purposefully direct and/or directed their actions toward the State of New Mexico, where Zorro Ranch served as a hub for the criminal enterprise.

15. Venue is proper under 28 U.S.C. § 1391(b)(2). Venue is proper in this district because a substantial part of the conduct giving rise to the State's claims occurred in this District, it is the location where Plaintiff is situated, and because Defendants transact and/or transacted business in this District.

## PARTIES

16. Plaintiff State of New Mexico is a sovereign state of the United States. The Attorney General of New Mexico brings this action on behalf of the State of New Mexico ("State" or "New

Mexico”), pursuant to his authority under, *inter alia*, N.M. STAT. ANN. Sections 8-5-1 to -17 (1933, as amended through 1999); the New Mexico Racketeering Act, N.M. STAT. ANN. § 30-42-6 (1980); the Trafficking Victims Protection Act (“TVPA”), 18 U.S.C. §§ 1591 to 1595; and his *parens patriae* authority to enforce the laws of New Mexico and protect the public interest, safety, health, and well-being of persons in New Mexico.

17. Defendant Indyke is named in his individual capacity as a person associated in fact with the Epstein Enterprise and is additionally named in his capacity as executor for the Epstein Estate and administrator of the 1953 Trust.

18. Defendant Kahn is named in his individual capacity as a person associated in fact with the Epstein Enterprise and is additionally named in his capacity as executor for the Epstein Estate and administrator of the 1953 Trust.

19. Defendant Estate of Jeffrey E. Epstein was established upon Epstein’s death and serves as the vehicle through which civil claims may be brought against Epstein after his death for legal liabilities related to sexual abuse, trafficking, and kidnapping as alleged herein.

20. Defendant The 1953 Trust (“1953 Trust” or “Trust”) was established by Epstein on January 18, 2019. Epstein amended and restated the trust most recently on August 8, 2019, two days before his death. Pursuant to the Last Will and Testament of Jeffrey E. Epstein, also dated August 8, 2019, Epstein “g[a]ve all of [his] property, real and personal, wherever situated,” following payments and distributions for estate expenses, to the 1953 Trust. Thus, the Trust is named as a Defendant not because it engaged in racketeering activity or violations of the TVPA, but because it holds the assets of the Estate through which the State seeks to satisfy any relief granted, pursuant to N.M. STAT. ANN. Section 30-42-6(C)–(D).

## FACTUAL ALLEGATIONS

### A. Epstein's Estate and the 1953 Trust

21. Epstein was found dead on August 10, 2019, while in custody in New York on federal sex trafficking charges.

22. Two days earlier, on August 8, 2019, Epstein had both "amended and restated" the terms of the 1953 Trust and also signed his Last Will and Testament. Epstein transferred all of his "property, real and personal, wherever situated" to the 1953 Trust, which contains Epstein's financial assets. The 1953 Trust is financially liable for the acts committed by Epstein and by the Epstein Enterprise described below.

23. Probate proceedings related to Epstein's will and assets are currently pending in the U.S. Virgin Islands.

24. As of August 15, 2019, when Indyke filed the petition for probate for Epstein's Estate, the Estate was valued at $577,672,654.00 and included 10,000 shares of Cypress, Inc., which held title to the Zorro Ranch property.

25. The Estate's value has diminished significantly. As of the public accounting filed in the probate proceedings for the period ending June 30, 2026, the Estate is currently valued at over $107,000,000.

26. Per the terms of the 1953 Trust, the balance of the estate will be distributed to Epstein's beneficiaries, including bequests to Indyke and Kahn of $50 million and $25 million from the Estate, respectively, assuming availability of funds.

### B. Epstein's Modus Operandi

27. The Epstein Enterprise preyed on girls and young women who were vulnerable because

they sought financial, educational, or career opportunities and support. Either Epstein himself or Enterprise associates, often Ghislaine Maxwell, would assure the survivor that accepting an invitation to meet or stay with Epstein would help them in this regard. Once at the property and isolated from the outside world, Epstein or an associate would instruct or encourage the survivor to give Epstein a massage, suggesting that this was normal and that she would benefit, monetarily or otherwise, for the service. However, once drawn in, survivors were pressured and forced to engage in sexual acts.

28. As detailed in Epstein's sex trafficking indictment, a common pattern or practice was as follows: Epstein would typically be naked while the girl or young woman giving him a massage was nude or only partially clothed. During the massage, Epstein would masturbate and sexually abuse her, with the abuse at times escalating to rape.

29. These massages and assaults could be as frequent as three times a day, with Epstein receiving a massage from, or sexually assaulting, the same or different girls or young women over the course of a single day.

30. Following these encounters, Epstein would often pay the girl or young woman who provided the massage a few hundred dollars.

31. Epstein would also pay a few hundred dollars to a girl or young woman who recruited additional "friends," and he would require massages from these new girls or young women and also sexually assault them.

32. To pay for these "massages" and new recruits, Epstein required a steady stream of cash, which Indyke and Kahn made available from Epstein's accounts.

33. Indeed, between 2002 and 2013, Epstein or others acting on his behalf withdrew over

$6 million in cash from his bank accounts—an average amount of over $1,700 per day. Even between 2013 and 2017, after Epstein had pled guilty for a sexual offense and registered as a sex offender, Indyke alone withdrew over $200,000 per year—an average of over $500 per day—in cash from Epstein's accounts at a single bank. Indyke repeatedly asked bankers at Deutsche Bank AG ("Deutsche Bank" or "DB") how he could withdraw cash from Epstein's accounts without triggering an alert with the government, leading the bank to formally exit its relationship with Epstein in December 2018.

**C. The Epstein Enterprise**

34. From at least 1997 through Epstein's death in August 2019, the Epstein Enterprise was an ongoing association-in-fact comprised of Epstein, Maxwell, Indyke, Kahn, Jean-Luc Brunel, Epstein's personal assistants, household staff at the Zorro Ranch and other Epstein properties, pilots, and others who facilitated and/or knowingly participated in the targeting, recruitment, transportation, confinement, and sexual exploitation of vulnerable girls and young women for Epstein's personal gratification and trafficking by him to other wealthy, influential men. The identities of many of those wealthy, influential men remain unknown today.

35. The Enterprise was an ongoing association-in-fact with a common purpose and a division of labor, and its members functioned as a continuing unit from at least 1997 through August 2019. As indicated above, the Enterprise included members who are not named as Defendants in this action.

36. Epstein led the Enterprise and made its principal decisions, even though no formal corporate structure existed. These decisions included which girls and young women would be transported to him or other prominent men; what properties they would be transported to; how

survivors would be transported, paid, controlled, and silenced; and whether to engineer corporate entities and relationships, or financial transactions to facilitate the abuse and trafficking.

37. The informal members of the Enterprise performed functions within parameters set by Epstein. Enterprise members identified girls and young women who could be targeted by Epstein; helped make them more receptive to his advances; and delivered false promises of educational, career, or financial assistance as ordered or approved by Epstein.

38. Maxwell served as one of the Enterprise's principal recruiters and facilitators and, together with Epstein, participated directly in the abuse of survivors at Zorro Ranch and other properties. Travel coordinators arranged commercial and private flights to Zorro Ranch and other properties. Household staff and personal assistants maintained the properties where survivors were isolated and abused. Indyke and Kahn each made cash available from Epstein's accounts so he could pay survivors and, from these accounts, also arranged direct payments to or purchases of goods or services for survivors.

39. Enterprise members at times used the terms "massage" and "work" as code for sexual abuse.

40. Indyke and Kahn were enmeshed in the functioning of the Enterprise and provided more than ordinary legal and accounting services. Through their professional services, each helped manage the money that fueled the Enterprise's operations and the Epstein-related corporate entities used to shield his transactions from outside scrutiny and suspicion.

a. Indyke served as Epstein's personal attorney from approximately 1995 or 1996 until Epstein's death. He served as an officer and director of several Epstein-related entities, including Cypress, Inc. and Zorro Development Corp. He handled the

transfer of title to Zorro Ranch to Cypress, Inc. by special warranty deed dated December 19, 2011, and he provided corporate financial management for Zorro Ranch and Epstein's other properties.

b. Kahn served as Epstein's accountant from approximately 2005 or 2006 until Epstein's death. He served as Treasurer and Director of Cypress, Inc., was a member of HBRK Associates, a financial and administrative hub for Epstein's properties, and was involved in the daily financial and personnel decisions for Epstein's residential properties, including Zorro Ranch.

41. Publicly available materials suggest that there was no legitimate source for Epstein's income and wealth, and that his wealth over time was amassed through a series of fraud, lies, and schemes—a fact that would have been known to Indyke and Kahn and would have further confirmed that the Epstein Enterprise's purpose, activities, and revenue were tied to sex-trafficking.

42. Indyke and Kahn were compensated for these roles. *See supra* ¶¶7-8.

43. Indyke and Kahn also performed the Enterprise's financial functions. They arranged payments to survivors to purchase their silence and leave them indebted to Epstein, handled costs for expenses connected to the abuse, monitored survivors' spending, and prepared tax returns for some survivors.

44. The Enterprise operated through corporate entities that Epstein owned, controlled, and managed, including Zorro Trust, Zorro Development Corporation, Darren K. Indyke PLLC, HBRK Associates, Little Saint James, LLC, Cypress, Inc., and Zorro Management, LLC. These entities were vehicles for the Enterprise's affairs, separate from the Enterprise itself. They held titles to properties, paid staff and contractors, held bank accounts used for payments connected to

the Enterprise, and moved funds and properties among one another to shield assets and conceal the Enterprise's activities.

45. Zorro Trust was founded as an Ohio-based trust on March 1, 1993, and served as the original holding entity for Zorro Ranch upon its purchase, with Epstein as trustee.

46. Zorro Development Corp. is or was a foreign profit corporation registered in New Mexico but incorporated in Delaware. Indyke served as its Secretary and was a signatory on its bank account between December 20, 2016 and July 8, 2019. The corporation was created to manage and operate Zorro Ranch. It was registered at the ranch's address, 49 Zorro Ranch Road, Stanley, New Mexico 87056, and it employed or contracted with individuals who worked at or for Zorro Ranch. Zorro Development Corp. made payments to a New Mexico massage therapist, Jane Doe 2 (*see infra* ¶¶ 84-91), who provided Epstein massages at Zorro Ranch and was sexually assaulted by Epstein there.

47. Darren K. Indyke PLLC is or was a professional limited liability company established by Indyke, through which he provided overall corporate financial management of Epstein's properties, including Zorro Ranch.

48. HBRK Associates is or was a legal entity comprised of Epstein's accountants, Kahn and Harry Beller. HBRK served as a financial and administrative hub for Epstein's properties, including Zorro Ranch, and Epstein was its sole client.

49. Cypress, Inc. is or was a Virgin Islands corporation that held title to Zorro Ranch at the time of Epstein's death. Epstein served as its President and Director; Indyke served as its Vice President, Secretary, and Director; and Kahn served as its Treasurer and Director. Cypress, Inc. also leased adjacent state lands.

50. Zorro Management, LLC is or was an entity registered in the U.S. Virgin Islands with an associated Deutsche Bank account on which Epstein and Indyke were signatories.

51. The Enterprise continued for more than two decades, from at least 1997 through August 2019. Flight records reflect that girls and young women traveled to Zorro Ranch between 1997 and 2018, either with Epstein or through arrangements made by the Enterprise. Epstein regularly created new entities, often with Indyke or Kahn as officers or directors, and transferred properties and funds among them to shield assets and conceal the Enterprise's activities. These changes in entity form did not alter the Enterprise's purpose or functions. Epstein continued to direct its affairs, and Indyke and Kahn continued to perform their roles throughout.

52. The Enterprise derived substantial benefit from its activities by using survivors to cultivate and retain relationships with wealthy, powerful, and influential business associates. It provided those associates with access, opportunity, and privacy to engage in illicit activities involving the abuse, transportation, restraint, and confinement of survivors.

53. For example, in or about 2011 or 2012, Epstein instructed a survivor to provide a "massage" to Jes Staley, then head of JPMC's private bank and asset management division, who helped keep Epstein's accounts active despite internal concerns about illicit activity and shared nonpublic information with Epstein. During the "massage," Staley forced the survivor to touch his genitals and then raped her.

54. Defendants Indyke and Kahn are distinct from the Enterprise, which also consisted of Epstein, Maxwell, personal assistants, recruiters, staff, pilots, and other individuals, and it used corporate entities as vehicles for its affairs.

55. Indyke knowingly associated with the Enterprise. He held positions and performed

functions that gave him some part in directing the Enterprise's affairs, and conducted or participated, directly or indirectly, in those affairs through the pattern of racketeering activity alleged in this complaint, *see infra* ¶¶ 16-58; 120-158. Furthermore, Indyke acted with the specific intent of conducting the Enterprise's affairs.

56. Kahn knowingly associated with the Enterprise. He held positions and performed functions that gave him some part in directing the Enterprise's affairs, and conducted or participated, directly or indirectly, in those affairs through the pattern of racketeering activity alleged in *see infra id.* Furthermore, Kahn acted with the specific intent to conduct the Enterprise's affairs.

57. Members of the Epstein Enterprise knowingly used means of force, threats of force, fraud, and coercion to subject girls and young women to engage in sex acts at his New Mexico ranch. The harm to Epstein's survivors was both foreseeable and deeply damaging.

58. During his deposition under oath regarding his activities, Epstein repeatedly invoked his Fifth Amendment privilege against self-incrimination when asked questions regarding whether he had engaged in sexual acts with underage females and procured underage females for prostitution. Evidence of Epstein's trafficking and sexual abuse, with the assistance of the Epstein Enterprise, is nonetheless clear.

**D. Zorro Ranch**

59. Epstein's Zorro Ranch was located at 49 Zorro Ranch Road, near Stanley, New Mexico, in Santa Fe County.

60. In 1993, Epstein acquired the land—approximately 7,600 acres—that would become Zorro Ranch from the family of the sitting governor of New Mexico, Bruce King. That same year,

Epstein also acquired grazing leases from the state that gave him a wider buffer of control and privacy around his property.

61. Epstein acquired Zorro Ranch through the Zorro Trust, an Ohio-based trust of which Epstein was then a trustee.

62. The nearest city to Zorro Ranch, Santa Fe, is over 30 miles to the north, and the closest neighbors to the ranch are miles away.

63. Epstein began construction of the main residence at Zorro Ranch after purchasing it in 1993 and eventually added eight guest houses. Upon completion, the main residence alone was over 28,000 square feet.

64. The entrance to Zorro Ranch was off of New Mexico State Road 41, "down a dirt road approximately a half mile," in "wild country" with "lots of open space" and "rattlesnakes." Access to the property was gated, with security controlling admission.

65. As one of the Epstein Enterprise's survivors testified during the trial of Epstein associate, trafficker, and girlfriend Ghislaine Maxwell: "… it was this giant ranch sort of in the middle of nowhere. And it seemed very empty on the interior, meaning there wasn't really any other people around."

66. Another survivor described Zorro Ranch as "its own miniature town that housed his servants and groundskeepers," with Epstein calling the main house his "castle."

67. [redacted]

68. The Zorro Ranch also featured a private airstrip and hangar, and a helicopter landing pad.

69. According to one source, Epstein spent approximately 50 days per year at Zorro Ranch and maintained five to six full-time staff members as well as seasonal employees at Zorro Ranch. At times, Epstein would arrive at Zorro Ranch with only 24-48 hours' notice and stay for 2-3 weeks at a time.

70. The property is depicted in Image 1, below:



71. After Epstein's 2019 death, Zorro Ranch was sold by the Estate to a private party in 2023. Defendant Kahn oversaw Zorro's sale.

### E. Survivor Accounts

***Jane Doe 1***

72. In 2006, the FBI interviewed Jane Doe 1, who recounted interactions she had with Epstein and Maxwell in New York and on Zorro Ranch in 1996. The interview was conducted in connection with the Southern District of Florida investigation of Epstein.

73. Jane Doe 1 recounted she was under the age of 18 when Epstein and Maxwell first assaulted her at Zorro Ranch.

74. Jane Doe 1 met Epstein during her junior year of high school, through her older sister, who was employed by Epstein. Epstein expressed interest in supporting and assisting Jane Doe 1 with her college applications and tuition fees. Epstein recommended that Jane Doe 1 consider traveling abroad to participate in volunteer work in Asia, which he advised would increase her qualifications for college applications. He offered to assist in paying for the trip.

75. Jane Doe 1's mother was contacted by Maxwell while Jane Doe 1 was a junior in high school to arrange a trip for Jane Doe 1 to visit New Mexico. Jane Doe 1 was led to believe the trip was intended for Maxwell and Epstein to get to know her better and finalize her summer plans for traveling to Thailand.

76. Epstein and/or Maxwell purchased Jane Doe 1 a flight ticket from Phoenix, Arizona to Santa Fe, New Mexico. When she arrived in Santa Fe, the Zorro Ranch manager picked her up. When she arrived at the ranch, Epstein made it clear Jane Doe 1 would be staying as a guest at the ranch. Jane Doe 1 was the only guest at the ranch at the time.

77. In New Mexico, Maxwell and Epstein intensified their efforts to groom Jane Doe 1 for abuse.

78. Maxwell and Epstein took Jane Doe 1 to a movie and went shopping. Maxwell and Epstein also discussed Jane Doe 1's school, classes, and family.

79. One evening at Zorro Ranch, Epstein asked if Jane Doe 1 would provide him with a foot massage. Jane Doe 1 was taken back by the request, and Maxwell gave a demonstration. Jane Doe 1 proceeded to give Epstein a foot massage. During the foot massage, Epstein asked if Jane Doe 1 had ever had a massage. Jane Doe 1 replied that she had not. Maxwell stood up and stated that she would give a massage to Jane Doe 1.

80. Maxwell led Jane Doe 1 to a room with a massage table and instructed Jane Doe 1 to undress and get on a massage table. Jane Doe 1 was made to undress in front of Maxwell and Epstein down to her underwear and remove her bra. Maxwell began massaging Jane Doe 1 and instructed Jane Doe 1 to roll over onto her back. After Jane Doe 1 did so, Maxwell then pulled down the sheet, exposing Jane Doe 1 to Epstein, who was nearby and continued to hold a conversation with Jane Doe 1 throughout the massage.

81. Jane Doe 1 was very self-conscious and uncomfortable with Epstein looking at her exposed body. Epstein asked Jane Doe 1, "aren't massages great." Maxwell completed the massage by rubbing Jane Doe 1's body, to include her breast.

82. The next morning, Epstein entered Jane Doe 1's room, got into bed with her, and stated he felt like "cuddling." Jane Doe 1 described Epstein as "spooning" her. Maxwell entered the room and observed Epstein under the covers of the bed with Jane Doe 1. In her interview, Jane Doe 1 recounted that later that night, Epstein again entered Jane Doe 1's room and sat on the bed with her. She recalled that he stroked her hair and told her how pretty she was. However, at this point in Jane Doe 1's interview, she became visibly disturbed and was unable to recall the

remainder of events for that evening at the ranch.

83. Jane Doe 1 was abused and trafficked by Epstein and his associates.

***Jane Doe 2***

84. Jane Doe 2 was a massage therapist who was interviewed by federal prosecutors in New York and spoke with the FBI and to media outlets about her interactions with Epstein and Maxwell on Zorro Ranch.

85. Jane Doe 2 reported to the FBI that she performed massages at private homes. She served as a professional massage therapist at Zorro Ranch for three years starting in 1999.

86. Jane Doe 2 reported that "the massages turned sexual with Epstein."

87. [redacted]

88. Maxwell told her, "If you have any more friends who want to come out, they have to [be] good looking, pretty, young, no hairy pits."

89. As with others, Epstein used his power, influence, and money to lure Jane Doe 2 and coerced her to comply with his demands.

90. [redacted]

91. Approximately two years after Jane Doe 2 started going to Zorro Ranch, she was given a nondisclosure agreement, but she did not sign it and stopped going to the ranch shortly thereafter.

***Jane Doe 3***

92. Jane Doe 3 testified in court in New York on August 27, 2019 about being abused by Epstein at Zorro Ranch in 2004.

93. When Jane Doe 3 was 15, she flew on Epstein's plane to Zorro Ranch, where he sexually assaulted her for many hours. She stated, "What I remember most vividly was him explaining to me how beneficial the experience was for me and how much he was helping me to grow."

94. She continued, "I remember feeling so small and powerless, especially after he positioned me by laying me on his floor so that I was confronted by all the framed photographs on his dresser of him smiling with wealthy celebrities and politicians."

95. She stated, "After he finished with me, he told me to describe in detail how good my first sexual experience felt." She recounted, "That was the first of many lies I was forced to carry for him, the weight of which proliferated my trauma."

96. She stated that she "felt powerless not merely because one man wanted to strip me of my innocence, but because I was the survivor of a system that just disenfranchises human beings, making them vulnerable to pedophilic exploitation."

97. The night after she was molested, she and another girl took two of his ATVs and raced them across the mesa. She crashed hers and expressed concern that she would get in trouble. The other girl responded, "Don't worry, no one gets in trouble for anything here."

***Jane Doe 4***

98. Jane Doe 4 reported that she was transported to and sexually abused at Zorro Ranch while under 18, in or around 2000 to 2001.

99. Jane Doe 4 wrote about her experience and described having been flown to Zorro Ranch, comparing the property to Disneyland and stating that Epstein referred to the main house as "his castle."

100. Jane Doe 4 recounted being sexually abused by Epstein multiple times at Zorro Ranch. She recounted that on one occasion, Maxwell and Epstein abused her and another survivor, while she and another survivor performed massages for Epstein in the movie room at Zorro Ranch.

101. Jane Doe 4 also testified in a deposition that on at least one occasion she was trafficked to New Mexico to have sex with one of Epstein's associates.

***Jane Doe 5***

102. Jane Doe 5 stated she first met Epstein in New York when she was an aspiring ballet dancer. Jane Doe 5 was approached by a member of the Epstein Enterprise and was eventually recruited to give Epstein "massages."

103. Jane Doe 5 alleged in a lawsuit in the United States District Court for the Southern District of New York that she began performing massages (which initially, were not sexual) for Epstein more regularly and that he spent much of the time asking questions about Jane Doe 5, her professional plans, and her problems.

104. She alleged in her lawsuit that by the third visit, Epstein informed Jane Doe 5that he had resources that he would use to advance her career if she would do what he wanted her to do. He began to make the massages more sexual.

105. During "massages," Epstein would take business calls. On numerous calls, Jane Doe 5 heard Epstein using a very angry and threatening tone and voice, making it known to the other party and to Jane Doe 5 that he had the ability to cause serious harm to powerful people and anyone who did not cooperate with him. Jane Doe 5 alleged that it was clear that Epstein was extremely powerful and could cause serious harm to her if she disobeyed.

106. Epstein routinely paid Jane Doe 5 for the sex acts, which he called "massages."

107. Epstein regularly reminded Jane Doe 5 that she could afford her mother's rent and her own groceries because of the money he provided for commercial sex.

108. Epstein took Jane Doe 5 to Zorro Ranch a number of times between 2007 and 2010 when she was in her early 20s. At Zorro Ranch, she was coerced to have sex with Epstein and other members of the Epstein Enterprise.

***Jane Doe 6***

109. In an FBI interview in 2019, Jane Doe 6 stated that she met Epstein when she was seventeen years old. He showed interest in her life and upbringing and kept in touch with her, offering to pay for her schooling.

110. He also invited her to his homes, including his home in New Mexico, which she recalls as being overwhelming.

111. She was sexually assaulted by Epstein four times before she turned 18, in New Mexico, Paris, and Florida. She reported that two of these four assaults were rapes where Epstein snuck into her room while she was sleeping.

***Jane Doe 7***

112. [redacted]

[redacted]

113. [redacted]

114. [redacted]

115. [redacted]

***Additional Survivors***

116. The specific survivors mentioned above are among many girls and young women whose sexual abuse and trafficking is specifically linked to Zorro Ranch.

117. Not only did Epstein and his associates lure and recruit girls and young women, including those whom he had only briefly or recently met, to Zorro Ranch for purposes of sexual abuse, but Epstein also abused his own business associates at Zorro Ranch.

118. Videos and images of survivors were taken at Zorro Ranch. Several binders containing sleeves of compact discs were found in Epstein's Manhattan residence by the FBI.

Some discs contained the word “Zorro” with one disc marked “[redacted] Zorro Pics.”

119. One survivor disclosed in an interview disclosed through the Epstein Files Transparency Act that Epstein, upon learning in November 2018 that she needed financial help, had Kahn wire her $250,000. On another occasion Epstein gave this same survivor $100,000. This survivor stated that during trips to New Mexico, Epstein led her to his bed where he would masturbate in her presence.

**F. Indyke’s and Kahn’s Involvement in the Epstein Enterprise**

120. Between approximately the mid-1990s (for Indyke) and approximately 2005 or 2006 (for Kahn) and continuing through Epstein’s death, Indyke and Kahn served as officers and directors in virtually every corporate entity that Epstein created to fund and conceal his illicit activities. Indyke and Kahn had signatory authority or power of attorney for many of Epstein’s bank accounts. Indyke and Kahn assisted with and facilitated the financial activities of the Epstein-owned entities, by approving, enabling, and justifying millions of dollars in payments that fueled the Epstein Enterprise’s sex trafficking, including payments to girls and young women who were sexually abused by Epstein and those who recruited others to be victimized.

121. Indyke and Kahn also had signatory authority over virtually all of the accounts held by the corporate entities used by the Enterprise to conduct its affairs. As of 2005, Indyke and Kahn held or managed at least 140 different bank accounts for Epstein and Epstein-owned entities, many of which existed only to transfer payments to other entities and accounts and, ultimately, to facilitate and conceal payments to his survivors and associates.

122. Indyke and Kahn both had signatory authority and/or were trustees for many of Epstein’s JPMC accounts, including the Butterfly Trust account, from which hundreds of thousands

of suspicious payments were made to women. Both men were also paid handsomely from Epstein's JPMC accounts: between 2003 and 2013 Indyke and his business received over $10 million and Kahn and his company received $4.9 million. JPMC terminated its banking relationship with Epstein in 2013, after which Epstein switched many of his accounts and financial relationships to Deutsche Bank. [redacted]—a staggering sum that could not have been accidentally overlooked by anyone with signatory authority, a fiscal management role, or other professional connection to these accounts.

123. Indeed, JPMC would ultimately conclude, as stated in an internal "Know Your Customer" document describing the decision to exit the relationship with Kahn, that Epstein was running a "sex trafficking ring" and "KAHN was a primary actor in the movement of EPSTEINs funds" and that Kahn "controlled the movement of EPSTEINs funds that potentially assisted in facilitating the sex trafficking ring."

124. Epstein's pattern of withdrawing large sums of cash, and his use of this cash for "massages," was sufficiently obvious that even personnel within JPMC commented that "[Epstein] has been known to pay cash for his massages" when examining Epstein's withdrawals of $160,000 in cash from August 2011 through March 2012—a rate of $20,000 per month. Indeed, this pattern resulted in a separate internal JPMC email observing that "the repetitive nature" of these "cash transactions is a problem for [the bank] and our relationship with [Epstein]." Indyke, an experienced lawyer, and Kahn, an experienced accountant, implausibly each denied knowledge that these cash transactions as structured would evade currency reporting requirements or otherwise draw scrutiny by outsiders.

125. In the final year of Epstein's banking with JPMC, charges to Epstein-related JPMC credit cards include, in a period of less than one year, over $3,700 to lingerie stores including Victoria's Secret and over $11,000 to spas, nail salons, the cosmetic store Sephora, and a high-end handbag repair store. Other financial records indicate over $3 million in payments—with no discernible business purpose—from Epstein-related accounts directly to girls or women over the decade from 2003 to 2013.

126. Even a nonprofit entity overseen by Indyke and Kahn served as a source of suspicious payments. Indyke and Kahn served as vice president and treasurer, respectively, of the C.O.U.Q. Foundation, Inc. ("COUQ"), a 501(c)(3) tax exempt entity formed by Epstein (President), Kahn (Treasurer), and Indyke (Vice President). In 2012, COUQ paid over $30,000 to girls or women for purposes apparently unrelated to the charity.

127. Between 2013 and 2019, Indyke and Kahn authorized and signed off on payments totaling hundreds of thousands of dollars to the Enterprise's sex trafficking survivors, including those who also acted as recruiters, and other expenses including legal fees, apartment rent, and tuition.

128. After Epstein was terminated by JPMC as a client and switched his banking relationship to DB, Indyke and Kahn continued to structure transactions and provide explanations for transactions that obscured the purpose of these transactions.

129. In particular, financial institutions are required to provide currency transaction reports ("CTRs") to the federal Financial Crimes Enforcement Network ("FinCEN") for any cash transactions—including deposits, withdrawals, or exchanges—exceeding $10,000 in a single business day.

130. Indyke had withdrawal authority for Epstein's DB accounts. During the period between 2013 and 2017, Indyke made 97 different cash withdrawals amounting to $200,000 each year. And in 2018, Indyke withdrew $100,000 from a single DB branch office, asserting the funds were for a legitimate business purpose of "tipping and household expenses" when they were instead used to pay women involved in Epstein's trafficking ring. Indyke deliberately structured these cash withdrawals to be below the $10,000 threshold at which bank reporting requirements apply. [redacted]

131. [redacted]

132. [redacted]

[redacted]

133. Separately, Kahn—a Certified Public Accountant with over twenty years of professional experience—implausibly testified before Congress that he was unaware of repeated $9,800 cash withdrawals from accounts associated with the Epstein Enterprise, and unaware that these transactions fell just two hundred dollars short of federal reporting limits.

134. [redacted]

135. [redacted]

[redacted]

136. DB nonetheless continued its banking relationship with Epstein and his associates, notwithstanding the flags [redacted], and not withstanding other subsequent suspicious transactions. Kahn provided information to DB to explain otherwise suspicious transactions. For example, in 2018, Kahn explained wires sent to Moscow-headquartered Sberbank as "payment[s] sent to a friend as tuition for school." And in 2019, Kahn's accounting firm HBRK Associates sought next-day pick up of 50,000 euros from DB, plus FedEx delivery of euros valued at $7,500 to a separate address.

137. The legal and financial services that Indyke and Kahn provided to Epstein resulted in their personal involvement in countless transactions that facilitated the trafficking and sexual abuse. For example, in 2017, Kahn emailed Epstein regarding payment of "the latest batch of medical expenses for girls," an expense apparently so routine that Kahn merely asked Epstein to confirm that "[Epstein] d[id] not want to see them" but the bills should be paid once confirmed for accuracy.

138. Indeed, attempts to move Epstein's money in questionable transactions continued until the time of his 2019 arrest. Just ten days before being arrested, Epstein attempted to purchase a palace in Morocco (a country that does not have an extradition treaty with the United States) for $27.7 million from a Schwab account with insufficient funds for the purchase. Kahn canceled the purchase transaction days after Epstein's arrest.

139. The sheer complexity of the infrastructure that Epstein set up and maintained with the

participation of Defendants Kahn and Indyke via the layers of accounts at various banks suggests its unlawful purpose.

### G. Recruitment, Control, and Trafficking of Girls & Young Women

140. Epstein, including by means of force, fraud, or coercion, as the ringleader of a sex trafficking venture, both enticed and recruited girls and young women, and caused others to entice and recruit girls and young women, to engage in commercial sex acts with Epstein and others. At times, after sexually assaulting these girls and young women, Epstein would pay hundreds of dollars in cash to the girls and young women. Epstein, either directly or with the assistance of others in the trafficking venture, would cause the girls or young women to travel to or be transported to his residences at which the abuse occurred, including to Zorro Ranch.

141. Beginning as early as 1996 and lasting as late as 2019, Epstein and his associates within the Epstein Enterprise trafficked girls and young women to Zorro Ranch, where Epstein and Maxwell groomed and sexually assaulted them.

142. Epstein was personally aware that a number of the girls whom he abused, including Jane Doe 1, Jane Doe 3, Jane Doe 4, Jane Doe 6, and Jane Doe 7, were minors.

143. Indyke and Kahn knew that Epstein was involved in various acts of coercion and assisted him in carrying out those acts. The Epstein Enterprise used false, fraudulent, and deceptive promises of providing or financially supporting professional modeling, performance arts, educational, and other opportunities, careers, and contracts to cause girls and young women to travel interstate or internationally to locations, including Zorro Ranch, where they were sexually abused and exploited.

144. Once girls and young women were recruited, participants in the Epstein Enterprise

controlled survivors by passport confiscation, controlling and extinguishing external communications, and threatening survivors with physical danger or violence. They also made fraudulent statements to family members of survivors, claiming survivors were being well-cared for and supported financially in college and other educational opportunities.

145. Throughout this time, and beyond 2019 through present, the Epstein Enterprise deliberately concealed its actions to prevent detection by New Mexico law enforcement.

146. Zorro Ranch's isolation facilitated the Epstein Enterprise's concealment of trafficking in New Mexico. The nature of the crimes and vulnerability and young age of the victims targeted by the Epstein Enterprise rendered disclosure to authorities more difficult. Epstein's great wealth and power made witnesses further reluctant to report their observations to local law enforcement.

147. Associates within the Epstein Enterprise, including Kahn and Indyke, took deliberate steps to conceal the sex trafficking and sexual abuse. These acts of concealment include, but are not limited to, the following:

a. Epstein using the seclusion of Zorro Ranch to hide the trafficking from detection by law enforcement and to isolate girls and young women during their stays at Zorro Ranch, many of whom had been transported there via private airplane or commercial aircraft and therefore lacked access to any ready means of departure or neighbors for help.

b. The Epstein Enterprise using private aircraft to transport girls and young women to the Zorro Ranch to hide this visible sign of trafficking from the public and law enforcement.

c. Zorro Ranch employees being directed not to communicate or interact with guests at Zorro Ranch and not to disclose to anyone events that occurred there.

d. Epstein, directly or indirectly creating, through services provided by Kahn and Indyke, multiple entities in which he appeared as president, director, manager, or sole member, for the purpose of forming a complex array of corporate entities, even within the ownership and operation of Zorro Ranch itself, to shelter Epstein's assets in order to fund, carry out, and conceal the Enterprise's pattern of criminal conduct.

e. Between 2003 and 2013, using Epstein's businesses and ostensibly charitable foundations to pay survivors who were trafficked and sexually abused, to avoid the transactions being detected by or reported to law enforcement and to reduce the likelihood that survivors would report abuse to law enforcement. Specifically, the C.O.U.Q. Foundation, Inc., a, paid over $30,000 to women in 2012 for purposes apparently unrelated to the charity.

f. Epstein and his associates preventing witnesses from cooperating with law enforcement by requiring them to sign confidentiality and non-disclosure agreements that prohibited them from speaking to or sharing information with law enforcement. If they were contacted by law enforcement, they were instructed to notify the Epstein Enterprise and be represented by Epstein's counsel.

g. In or around the Epstein's 2008 conviction and incarceration in Florida, the Epstein Enterprise or persons acting on its behalf instructing at least one witness to destroy vibrators and photographs described as nude images of young women.

### H. Indyke's and Kahn's Participation & Benefit from the Trafficking Venture

148. The complex web of interconnected enablers and companies surrounding Epstein's activities and facilitating his sexual abuse of girls and young women—the Epstein Enterprise—more than constitutes a venture under the TVPRA. Two or more individuals associated in fact, whether or not a legal entity, suffices to comprise a venture.

149. Indyke and Kahn each participated in the trafficking venture by providing personalized services for it, including but not limited to professional services as a lawyer (Indyke) and as an accountant (Kahn).

150. Indyke and Kahn each benefited from their participation in the trafficking venture by receiving salaries and compensation for their professional services provided.

151. Indyke actively facilitated and participated in the trafficking of girls and young women for Epstein's gratification by handling and managing finances associated with the trafficking scheme, including providing Epstein a ready supply of cash that he could and did use to pay girls and young women whom he subjected to commercial sex acts, while structuring the withdrawal of cash to avoid triggering CTR reports that could have flagged these cash withdrawals to bank or federal supervisors.

152. Indyke further actively facilitated and participated in the trafficking of girls and young women by assisting, through his role as an officer and director of Epstein-linked entities and a signatory on Epstein-linked financial accounts at multiple financial institutions, in the payment of substantial sums of money to trafficked girls and young women. Based on the frequency and high dollar amount of these cash withdrawals, in amounts unjustified by any business purpose and structured to avoid otherwise mandatory reporting requirements, with

withdrawals necessary at a second bank (DB) after the initial bank (JPMC) terminated the banking relationship, Indyke knew of or recklessly disregarded Epstein's illicit purpose.

153. Indyke received above-market compensation for his services, including more than $16 million from Epstein and Epstein-related entities over the period from 2011 to 2019, a loan of $7 million from Epstein that was never repaid, financial assistance from Epstein in purchasing homes in New Jersey and in Boca Raton, Florida, and coverage for multiple rounds of in-vitro fertilization. Indyke received compensation for his participation in the trafficking venture directly and via his ownership, investment, or control of other entities, including Darren K. Indyke LLC.

154. Kahn actively facilitated and participated in the trafficking of girls and young women for Epstein's gratification by handling and managing finances associated with the trafficking scheme, including overseeing financial accounts that paid for commercial airline tickets for travel of girls and young women to locations across the United States whom Epstein subjected to commercial sex acts; overseeing financial accounts that paid for lingerie, salon, and spa expenses for trafficked girls and young women; and arranging for payments of medical bills related to the trafficking of girls and young women. Kahn further actively facilitated and participated in the trafficking of girls and young women by assisting, through his role as an officer and director of Epstein-linked entities and a signatory on Epstein-linked financial accounts, in the payment of substantial sums of money to trafficked girls and young women. The frequency and high dollar amount of these transactions, to girls and young women with whom Epstein had no apparent familial relationship, established friendship, charitable interest, or apparent business purpose, which Kahn at times was required to explain to financial institutions, either put Kahn on notice or should have put Kahn on notice of the illicit purpose of these payments and purchases. Kahn

received above-market compensation for his services, including more than $10 million from Epstein and Epstein-related entities over the period from 2011 to 2019, and payment of $4.9 million from Epstein's JPMC accounts to Kahn's company, HBRK Associates, for the period from approximately 2005 or 2006 until 2013. Kahn received compensation for his participation in the trafficking venture directly and via his ownership, investment, or control of other entities, including HBRK Associates.

155. Kahn's and Indyke's concealment of the criminal conduct of the Epstein Enterprise continued until and after Epstein's death and continues to be present via their unwillingness to meaningfully participate in investigations into and proceedings related to Epstein's trafficking activities. Accordingly, the discovery of the nature, scope, and magnitude of Indyke's, Kahn's, Epstein's, or the Enterprise's unlawful conduct could not have been acquired earlier through the exercise of reasonable diligence.

156. The State of New Mexico has diligently pursued information about the Epstein Enterprise and its operations in New Mexico. As early as 2019, the New Mexico Department of Justice (NMDOJ) opened an investigation into criminal conduct at Zorro Ranch, which NMDOJ subsequently halted at the request of federal prosecutors at the U.S. Attorney's Office for the Southern District of New York, who subsequently breached their promise to provide results of their investigation to New Mexico. NMDOJ believed, in good faith, that the U.S. Attorney's Office would refer back any findings that potentially constituted a state crime.

157. The full extent of the Epstein Enterprise's activities, and Indyke's and Kahn's roles in concealing those activities, was hidden from the public for years and remains shielded from view. Congress passed the Epstein Files Transparency Act in November 2025, demanding the end

of secrecy regarding Epstein's crimes and aiming to facilitate accountability for those who participated in and facilitated his criminal activity. Only through the gradual release and unsealing of investigative files, court records, witness testimony, and other materials that comprise the "Epstein Files" has a more complete picture of the Enterprise's operations emerged. These documents include additional details of the involvement of numerous individuals, including Kahn and Indyke, in facilitating or concealing those activities.

158. The publicly available documents remain significantly redacted, and accordingly, the full scope of the Epstein Enterprise's illegal activities and fraudulent concealment has yet to come to light.

## CAUSES OF ACTION

### COUNT ONE
### Participating in a Sex Trafficking Venture
### Violation of Trafficking Victims Protection Act
### 18 U.S.C. §§ 1591(a)(1-2), 1595(d) (*Parens Patriae*)

159. The State of New Mexico restates and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

160. The State of New Mexico brings this Count pursuant to the Attorney General's *parens patriae* powers and express statutory authority to assure New Mexico residents that the State will take action to prevent, investigate, and prosecute sex-trafficking and to protect them from the harmful effects of such criminal activity.

161. Indyke provided, obtained, and maintained services and property in furtherance of the Epstein Enterprise's trafficking scheme in exchange for financial benefit.

162. Indyke knowingly and intentionally benefitted financially from and received value for

his participation in the sex trafficking venture in which the Epstein Enterprise was engaged, and with knowledge or reckless disregard of Epstein's and his associates' use of force, threats of force, fraud, coercion, and a combination of such means to sexually abuse girls and young women, including by causing them to engage in commercial sex acts at Zorro Ranch and elsewhere.

163. Indyke profited in exchange for his knowing facilitation of and implicit participation in Epstein's sex trafficking venture, and in doing so, knew, recklessly disregarded, and even concealed Epstein's pattern and practice of using the channels and instrumentalities of interstate and foreign commerce to recruit, entice, harbor, transport, obtain, and maintain girls and young women for purposes of causing them to engage in commercial sex acts in violation of 18 U.S.C. § 1591(a)(1)-(2).

164. Indyke, based on his extensive involvement in Epstein's financial transactions, as well as his professional training, knew or recklessly disregarded that he was facilitating Epstein's sexual abuse and sex trafficking venture.

165. Despite this knowledge, Indyke intentionally concealed, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591 (a)(1)-(2) and thereby actively facilitated or participated in the sex trafficking venture.

166. Kahn provided, obtained, and maintained services and property in furtherance of the Epstein Enterprise's trafficking scheme in exchange for financial benefit.

167. Kahn knowingly and intentionally benefitted financially from and received value for his participation in the sex trafficking venture in which the Epstein Enterprise was engaged, and with knowledge or reckless disregard of Epstein's and his associates' use of force, threats of force,

fraud, coercion, and a combination of such means to sexually abuse girls and young women, including by causing them to engage in commercial sex acts, at Zorro Ranch and elsewhere.

168. Kahn profited in exchange for his knowing facilitation of and implicit participation in Epstein's sex trafficking venture, and in doing so, knew, recklessly disregarded, and even concealed Epstein's pattern and practice of using the channels and instrumentalities of interstate and foreign commerce to recruit, entice, harbor, transport, obtain, and maintain girls and young women for purposes of causing them to engage in commercial sex acts in violation of 18 U.S.C. § 1591(a)(1)-(2).

169. Kahn, based on his extensive involvement in Epstein's financial transactions, as well as his professional training, knew or recklessly disregarded that he was facilitating Epstein's sexual abuse and sex trafficking venture.

170. Despite this knowledge, Kahn intentionally concealed, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591 (a)(1)-(2) and thereby actively facilitated or participated in the sex trafficking venture.

171. This knowing and intentional conduct has caused serious harm to the State of New Mexico and its residents, including without limitation financial harm, by facilitating the sexual abuse of girls and young women, including their engagement in commercial sex acts, in New Mexico.

172. Indyke's and Kahn's individual violations of the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking venture operated in and from New Mexico. This conduct also evidenced a high degree of moral turpitude and demonstrated such wanton disregard for the safety of girls and young women in New

Mexico and elsewhere as to imply a deliberate indifference to its legal obligations.

173. By virtue of these knowing and intentional violations of 18 U.S.C. § 1591 (a)(1)-(2), Defendants Indyke and Kahn are liable for all appropriate relief under 18 U.S.C. § 1595(d), including compensatory and punitive damages to those injured by Defendants, disgorgement to those injured by Indyke and Kahn, restitution, attorneys' fees, and other equitable relief as the Court deems appropriate.

## COUNT TWO
## Violation of the NM Racketeering Act, N.M. STAT. ANN. § 30-42-4(C)
## Kidnapping

174. The State of New Mexico restates and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

175. As alleged above, Defendants Indyke, Kahn, and Epstein (Estate of Jeffrey E. Epstein) (as referred to in this Count Two, "Defendants") have received proceeds derived, directly or indirectly, from a pattern of racketeering activity in which each of these Defendants participated, either to establish or operate an enterprise that engaged in a pattern and practice of kidnapping and criminal solicitation in violation of the New Mexico Racketeering Act.

176. The Epstein Enterprise recruited, transported, transferred, harbored, received, provided, obtained, isolated, maintained, and enticed girls and young women in the furtherance and performance of sex trafficking and sexual abuse, either of minors or through deception, intimidation, or force. In furtherance of these crimes, the Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by the Racketeering Act.

177. Specifically, as part of this pattern of racketeering activity, Defendants Indyke and Kahn engaged in kidnapping in violation of New Mexico law (N.M. STAT. ANN. § 30-4-1) by, *inter alia*:

a. Unlawfully taking, restraining, transporting, or confining survivors by force, intimidation, or deception with the intent to commit a sexual offense against the survivors. Specifically, Epstein deceived survivors with false promises of educational assistance, career advancement, financial support, and other benefits;

b. Recruiting and transporting survivors to Zorro Ranch and other locations controlled by the Epstein Enterprise. Once there, Epstein confined survivors against their will, held them to service against their will, and exercised control over them through various tactics, either personally or through others at his direction, through intimidation, coercion, psychological manipulation, and continued deception, including but not limited to threatening reputational harm; threatening abuse of process; passport confiscation; controlling and extinguishing external communications, and threatening violence.

178. Defendants Indyke and Kahn each committed their respective acts with the intent that survivors be confined against their will; that survivors engage in commercial sex acts against their will; and that sexual offenses be inflicted upon them during their confinement, thereby furthering the purposes and objectives of the Epstein Enterprise.

179. For instance, Jane Doe 1was under the age of 18 when she was first transported to Zorro Ranch based on deception. She was the only guest at the sprawling estate, where she was led to

believe the trip was intended as an opportunity for Maxwell and Epstein to get to know Jane Doe 1 better and finalize plans for her summer trip to Thailand. Maxwell and Epstein used Jane Doe 1's trip to Zorro Ranch as an opportunity to isolate, groom, and abuse her.

180. Jane Doe 3 was transported on Epstein's personal plane through deception to Zorro Ranch when she was 15 years old. Jane Doe 3 was transported with the intent of being sexually abused by Epstein, who did so for hours.

181. Jane Doe 4 was transported to Zorro Ranch through intimidation and deception for the purpose of being sexually abused at Zorro Ranch and to be held to service by Epstein to be sexually abused by others.

182. Jane Doe 5 was transported to Zorro Ranch through intimidation for the purpose of sexual abuse by Epstein and others. Epstein used his money and power to intimidate Jane Doe 5 to have sex with Epstein and others.

183. Jane Doe 6 was transported to Zorro Ranch through intimidation and/or deception for the intent of being sexually abused.

184. Jane Doe 7 was brought to Zorro under deception, believing she was there to provide massages to Epstein and guests. Epstein, instead, forced Jane Doe 7 to have non-consensual sex with him.

185. Each of these Defendants, through a pattern of criminal activity, acquired and maintained, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

186. The pattern of kidnapping was not isolated but was related to and conducted through the affairs of the Epstein Enterprise, in willful violation of the Racketeering Act.

187. As a direct and proximate result of each of these Defendants' individual wrongful

actions and inactions, the State of New Mexico and its residents sustained injury to person, business, and property. Each of these Defendants' wrongful actions and inactions directly and proximately caused injury to the girls and women who were trafficked, abused, coerced, held against their will, and solicited through the Epstein Enterprise.

188. In addition, the State brings this Count pursuant to N.M. STAT. ANN. § 30-42-6(B) on behalf of people injured by the pattern of racketeering activity in New Mexico and to prevent, restrain, and remedy the racketeering activity and its effects.

**COUNT THREE**
**Violation of the NM Racketeering Act, N.M. STAT. ANN. § 30-42-4(C)**
**Criminal Solicitation**

189. The State of New Mexico restates and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

190. At all times material herein, Defendants Indyke, Kahn, and Epstein (Estate of Jeffrey E. Epstein) (as referred to in this Count Three, "Defendants") each directly and indirectly participated in or associated with the Epstein Enterprise, an illicit association-in-fact.

191. The purpose of New Mexico's Racketeering Act "is to eliminate the infiltration and illegal acquisition of legitimate economic enterprise by racketeering practices and the use of legal and illegal enterprises to further criminal activities." N.M. STAT. ANN. § 30-42-2.

192. Under the Act, "racketeering" means any act that is chargeable or indictable under the laws of New Mexico and punishable by imprisonment for more than one year," involving one of a set of enumerated offenses. N.M. STAT. ANN. § 30-42-3(A). One of the enumerated acts is Criminal Solicitation. (Enumerated at N.M. STAT. ANN. § 30-42-3(16), as defined by N.M. STAT. ANN. § 30-28-3.)

193. Each Defendant named herein is a distinct "person" capable of holding a legal or beneficial interest in property. N.M. STAT. ANN. § 30-42-3(B).

194. The Epstein Enterprise was an "enterprise" within the meaning of N.M. STAT. ANN. 1978, § 30-42-3(C), which includes "a group of persons associated in fact although not a legal entity" and "includes illicit as well as licit entities."

195. Each of these Defendants have benefitted, directly or indirectly, from a pattern of racketeering activity, in which each of these Defendants participated, to establish and operate an enterprise that engaged in a pattern and practice of criminal solicitation in violation of the New Mexico Racketeering Act.

196. The Epstein Enterprise functioned to provide wealthy, powerful men access, opportunity, and privacy to engage in illicit activities involving the sexual abuse, transportation, restraining, or confinement of Epstein's survivors.

197. Members of the Epstein Enterprise solicited, recruited, transported, provided, isolated, maintained, and enticed girls and young women in the furtherance and performance of sex trafficking and sexual abuse, either of minors or through deception, intimidation, or force.

198. In furtherance of these crimes, the Epstein Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by the Racketeering Act.

199. As part of this pattern of racketeering activity, Defendants Indyke and Kahn each engaged in criminal solicitation in violation of New Mexico law (N.M. STAT. ANN. § 30-28-3), by intending that another person engage in conduct constituting a felony, soliciting, commanding, requesting, inducing, employing, or otherwise attempting to promote or facilitate that other person's engagement in conduct constituting a felony, either within or without the state of New

Mexico.

200. Specifically, Defendant Indyke and Kahn each managed and arranged for funds that were used to promote or facilitate another member of the Enterprise to:

a. Recruit, solicit, entice, transport, confine, restrain, or obtain by any means girls and young women to Zorro Ranch with the intent or knowledge that force, intimidation, or deception would be used to inflict sexual offense on the victim;

b. Recruit, solicit, entice, transport, or obtain by any means girls and young women under the age of eighteen years to Zorro Ranch with the intent or knowledge that the girls and young women would be caused to have a sexual offense inflicted on them; and

c. Benefit, financially or by receiving anything of value, from the labor, services, or commercial sexual activity of girls and young women being transported, confined, or restrained at Zorro Ranch with knowledge of the illegal activity.

201. Indyke and Kahn, each through a pattern of criminal activity, acquired and maintained for himself, directly or indirectly, an interest in or control of the Epstein Enterprise or real property.

202. Indyke and Kahn each benefited, directly and indirectly, from the pattern of criminal activity conducted by the Epstein Enterprise.

203. The Epstein Enterprise derived substantial benefit from the criminal solicitation described above, through which Epstein's network of influential people and personal fortune were maintained and expanded.

204. The pattern of criminal solicitation was not isolated but was related to and conducted through the affairs of the Epstein Enterprise, in willful violation of the Racketeering Act.

205. Each of these Defendants' wrongful actions and inactions directly and proximately caused injury to the girls and young women who were trafficked, abused, coerced, held against their will, and solicited through the Epstein Enterprise.

206. In addition, the State brings this Count pursuant to N.M. STAT. ANN. § 30-42-6(B) on behalf of people injured by the pattern of racketeering activity in New Mexico and to prevent, restrain, and remedy the racketeering activity and its effects.

**COUNT FOUR**
**Violation of the NM Racketeering Act, N.M. STAT. ANN. § 30-42-4(D)**
**Conspiracy to Engage in Racketeering**

207. The State of New Mexico restates and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

208. Indyke and Kahn each agreed, by words or acts, with Epstein, Maxwell, and other members of the Epstein Enterprise to conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity, including kidnapping and criminal solicitation described in other allegations in this Complaint.

209. Indyke and Kahn each knew that the Enterprise's purpose included recruiting, transporting, intimidating, misleading, and sexually abusing girls and young women, and each intended that the Enterprise's members would commit predicate acts in furtherance of that purpose.

210. In furtherance of that agreement, Indyke and Kahn each performed the acts described in this Complaint, *supra* ¶¶ 16-58; 120-179, including making cash available from Epstein's accounts used to pay girls and young women and structuring cash withdrawals to avoid currency transaction reporting.

211. Under N.M. STAT. ANN. § 30-42-4(D), a conspirator need not personally have committed or agreed to commit two predicate acts, and each conspirator is responsible for criminal acts of co-conspirators committed in furtherance of the conspiracy.

212. Each of Defendants Indyke, Kahn, and Epstein's (Estate of Jeffrey E. Epstein) individual wrongful actions and inactions directly and proximately caused injury to the girls and young women who were trafficked, abused, coerced, held against their will, and solicited through the Epstein Enterprise.

213. In addition, the State brings this Count pursuant to N.M. STAT. ANN. § 30-42-6(B) on behalf of people injured by the conspiracy to commit racketeering activity in New Mexico and to prevent, restrain, and remedy the racketeering activity and its effects.

**COUNT FIVE**
**Equitable Recovery Under Principles of**
**Restitution and Unjust Enrichment**

214. The State of New Mexico restates and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

215. As a direct and proximate result of Defendants Indyke, Kahn, and Epstein's (Estate of Jeffrey E. Epstein) participation in the Epstein Enterprise, which has engaged in sex trafficking of underage girls and young women, each of these Defendants have been unjustly enriched.

216. By virtue of the positions Defendants Indyke and Kahn held in corporate entities registered and doing business in New Mexico, they benefited from the laws and regulations governing the creation and operation of such entities and granting the privilege to engage in business within the State.

217. This Court should find that Defendants have been unjustifiably enriched and order Defendants to disgorge all monies received as a result of their unlawful business practices.

218. This Court should also order restitution based on Defendants Indyke's and Kahn's individual participation in racketeering activity and a trafficking venture.

**PUNITIVE DAMAGES**

219. The purpose of punitive damages in the common law is to punish a defendant for conduct that is malicious, wanton, oppressive, or fraudulent, to deter others from engaging in such conduct in the future.

220. This Complaint describes intentional conduct so egregious, persistent, and injurious that it shocks the conscience and offends a civilized society.

221. Punitive damages are especially important in the case of persons or companies that have so much money, assets, and power that mere fines, penalties, and economic damages are simply not sufficient.

222. At all times material herein, Defendants Indyke, Kahn, and Epstein (Estate of Jeffrey E. Epstein) engaged repeatedly in wrongful acts that were intentional and outrageous. The State gives notice that it intends to pursue the possibility of punitive damages in any jury verdict.

**PRAYER FOR RELIEF**

**WHEREFORE,** the State of New Mexico, by and through its Attorney General, respectfully requests that the Court grant the following relief:

A. Enter a judgment in favor of the State and against Defendants on all counts;

B. Declare that Defendants Defendants Indyke, Kahn, and Epstein (Estate of Jeffrey E. Epstein) through the Epstein Enterprise, have engaged in a pattern of criminal activity in

violation of the Racketeering Act, including N.M. STAT. ANN. § 30-4-1 (Kidnapping) and N.M. STAT. ANN. § 30-28-3 (Criminal Solicitation)..

C. Pursuant to N.M. STAT. ANN. § 30-42-6(D)(1), order Defendants to divest themselves of any real property or other interests in the Epstein Enterprise in favor of the State of New Mexico, on behalf of persons injured by the Epstein Enterprise;

D. Pursuant to N.M. STAT. ANN. § 30-42-6(D)(2), impose reasonable restrictions on the future activities or investments of all Defendants named herein;

E. Pursuant to N.M. STAT. ANN. § 30-42-6(D)(4), award three times the damages to those injured by Defendants' racketeering;

F. Pursuant to N.M. STAT. ANN. § 30-42-6(D)(5), order the payment of all costs and expenses of the State of New Mexico in connection with the investigation and prosecution of the activity complained of herein, including attorneys' fees and costs.

G. Pursuant to 18 U.S.C. § 1595, award appropriate relief, including compensatory and punitive damages to those injured by Defendants, disgorgement to those injured by Defendants, restitution, attorneys' fees, and other equitable relief, as appropriate.

H. Pursuant to N.M. STAT. ANN. § 30-42-6(C) and 18 U.S.C. § 1595(d), issue an order preventing the co-executors of Defendant Estate of Jeffrey E. Epstein from making distributions from the Epstein Estate during the pendency of this litigation, to maintain the status quo while the State of New Mexico's claims are heard.

I. Award such equitable relief, including disgorgement of all ill-gotten gains in favor of those injured by Defendants, as may be just and proper and appropriate, to protect the rights of survivors and innocent persons in the interest of justice;

J. Assess and award a judgment in favor of the State and against Defendants for attorneys' fees and costs and pre- and post-judgment interest; and

K. Award any and all other relief this Court deems appropriate.

The State demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 21st day of October 2026.

**RAÚL TORREZ**
**ATTORNEY GENERAL OF NEW MEXICO**

By counsel,

*/s/ Aletheia V.P. Allen*
Aletheia V.P. Allen
*Solicitor General*

New Mexico Department of Justice
201 Third Street NW Suite 300
Albuquerque, New Mexico 87102
Phone: 505-527-2776
Email: aallen@nmdoj.gov